JM:NMA
F.#2010R00043

M11-856

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    -against-

ANTHONY CILENTO,
    also known as "December,"

        Defendant.

- - - - - - - - - - - - - - - - - - X

COMPLAINT AND AFFIDAVIT IN
IN SUPPORT OF APPLICATION
FOR ARREST WARRANT

(21 U.S.C. § 846)

EASTERN DISTRICT OF NEW YORK, SS:

    SAMANTHA BELL, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

    In or about and between 2002 and 2009, within the Eastern District of New York and elsewhere, the defendant ANTHONY CILENTO, also known as "December," together with others, did knowingly and intentionally conspire to distribute and possess with the intent to distribute five kilograms or more of a substance containing cocaine, a Schedule II controlled substance, in violation of Title 21, U.S.C. § 841(a)(1).

    (Title 21, United States Code, Section 846, 841(b)(1)(A)(ii)(II)).

    The source of your deponent's information and the grounds for her belief are as follows:

2

1. I have been a Special Agent with the FBI for approximately five years and am currently assigned to a squad that investigates public corruption. During my tenure with the FBI, I have participated in public corruption investigations. During the course of those investigations, I have conducted physical surveillance, monitored undercover operations, debriefed cooperating witnesses and confidential informants, monitored wiretaps and interviewed civilian witnesses.

2. Because this affidavit is being submitted for the purpose of establishing probable cause to arrest, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. The information set forth below is based upon my experience and training as an FBI Special Agent, my review of documents and other evidentiary items, debriefing of cooperating witnesses, and my discussions with other law enforcement agents. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only.

3. The FBI and the New York City Police Department ("NYPD") have been investigating a group of individuals in Brooklyn, New York, who, among other things, were involved in a narcotics distribution operation in which they arranged for the near-daily delivery of cocaine to customers who resided in

southwestern Brooklyn (the "Cocaine Delivery Service" or "Service").

4. During the course of the investigation, agents from the FBI and the NYPD received information about the Cocaine Delivery Service from three cooperating witnesses ("CW-1",[1] "CW-2"[2] and "CW-3"[3]), whose information has proven to be reliable.

5. CW-1 advised that s/he was the leader of the Cocaine Delivery Service. CW-1 further advised that, between

---

[1]   CW-1 pled guilty, pursuant to a cooperation agreement in the Eastern District of New York, to charges including conspiracy to distribute cocaine in violation of 18 U.S.C. § 846. S/he is cooperating with the government in the hopes of receiving leniency at sentencing and possible entry into the Witness Security Program. CW-1's information has been corroborated by other sources of information, including but not limited to surveillance, information provided by other confidential sources and NYPD files.

[2]   CW-2 pled guilty, pursuant to a cooperation agreement in the Eastern District of New York, to charges including conspiracy to distribute cocaine in violation of 18 U.S.C. § 846. CW-1 is cooperating with the government in the hopes of obtaining leniency at sentencing and entry into the Witness Security Program. CW-2's information has been corroborated by other sources of information, including but not limited to surveillance, information provided by other confidential sources and NYPD files. CW-2 has a significant criminal history, which includes home-invasion robberies, and is currently serving a state prison sentence.

[3]   CW-3 pled guilty, pursuant to a cooperation agreement in the Eastern District of New York, to charges including conspiracy to distribute cocaine in violation of 18 U.S.C. § 846. CW-3 is cooperating with the government in the hope of obtaining leniency at sentencing. CW-3's information has been corroborated by other sources of information, including but not limited to surveillance, information provided by other confidential sources and NYPD files.

approximately 2002 to 2009, ANTHONY CILENTO participated in the management of the Cocaine Delivery Service by, among other things: (1) answering the Services's telephone to intake and process customer requests for cocaine, (2) accompanying CW-1 to deliver cocaine to customers, (3) "bagging" cocaine, or separating bulk amounts of cocaine into sale quantity baggies, (4) meeting with drug runners responsible for distributing the cocaine, (5) accompanying CW-1 to meet his/her cocaine supplier, (6) meeting with the cocaine supplier on CW-1's behalf to purchase cocaine, and (7) allowing his house to be used to store cocaine, to serve as a staging area for cocaine to be "bagged" for distribution and for "switch-ups," when the operation's runners exchanged cocaine during shift changes. CW-1 advised that, on two separate occasions CILENTO assaulted a Service worker for stealing cocaine. On one occasion CILENTO broke the worker's nose and on another occasion, CILENTO broke a paintball gun over the worker's arm. CW-1 further advised that CILENTO assaulted several other Service workers in furtherance of the Cocaine Delivery Service. According to CW-1, between 2004 and 2007, the Cocaine Delivery Service distributed approximately 15 ounces per week. CW-1 advised that CILENTO ceased his involvement with the Cocaine Delivery Service in approximately 2009 when CILENTO began training for entry into the New York City

Fire Department ("FDNY"). CW-1 further advised that CILENTO was also known as "December."

   6. CW-2 advised that he worked for the Cocaine Delivery Service from June 2006 to December 2008. According to CW-2, CILENTO was the "muscle guy" for the Cocaine Delivery Service. CW-2 advised that CILENTO participated in the Cocaine Delivery Service by, among other things: (1) driving CW-2 to deliver cocaine to customers, (2) allowing his house to be used for "switch-ups," and (3) assaulting individuals in furtherance of the Cocaine Delivery Service. For example, CW-2 advised that CILENTO broke the nose of one of the Service's workers because the worker stole cocaine instead of selling it. CW-2 advised that, on multiple occasions, CILENTO purchased drugs from CW-2 for his personal use. According to CW-2, CILENTO's participation in the Cocaine Delivery Service continued until CILENTO joined the FDNY. CW-2 advised that CILENTO was also known as "December."

   7. CW-3 advised that s/he worked for the Cocaine Delivery Service from approximately September 2007 until May 2009. According to CW-3, CILENTO bought drugs regularly from CW-1, and on several occasions CILENTO drove CW-3 in CILENTO's vehicle to make cocaine deliveries in exchange for cocaine. CW-3 advised that, on one occasion, s/he used CILENTO's house for a

6

"switch-up." CW-3 further advised that CILENTO stopped buying cocaine from CW-3 when he began training for the FDNY.

8. Because public filing of this document could result in a risk of flight by the defendant, as well as jeopardize the government's investigation, your deponent respectfully requests that the complaint and arrest warrant be filed under seal.

WHEREFORE, your deponent respectfully requests that the defendant be dealt with according to law.

_____
SAMANTHA BELL
Special Agent
Federal Bureau of Investigation

Sworn to before me this
____ day of August 2011

ER
E
EASTERN DISTRICT OF NEW YORK